APPEAL NO. 24-1488

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ABHIJIT BAGAL,

*Plaintiff-Appellant*,

*(Pro Se)*

v.

KSHAMA SAWANT, in her official and individual capacities as Councilmember, District 3, of the Seattle City Council;

LISA HERBOLD, in her official and individual capacities as Councilmember, District 1, of the Seattle City Council; and

BRUCE HARRELL, in his official and individual capacities as the Mayor of the City of Seattle,

*Defendants-Appellees.*

On Appeal from the United States District Court
Western District of Washington at Seattle
Case No. 2:23-CV-00721-RAJ, Hon. Richard A. Jones

## APPELLANT'S REPLY BRIEF

ABHIJIT BAGAL
125 Vista Brooke Drive
Morrisville, NC 27560
(919) 917-3839
abebagal@gmail.com

*Plaintiff-Appellant (Pro Se)*

**Stop Weaponization of caste to Single Out, Target, & Racially Profile Hindu Americans.**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

STANDARD OF REVIEW ..........................................................................4

ARGUMENT ........................................................................ 4

I.    PLAINTIFF HAS SUFFERED A CONCRETE INJURY IN FACT AND HAS VALID  STANDING ON ALL CLAIMS ….................. 4

II.    INCLUDING "CASTE" IN SCC's ORDINANCE VIOLATES THE FIRST AND FOURTEENTH AMENDMENTS .............................12

III.  SCC's ILLICIT MOTIVE, DISCRIMINATORY ANIMUS, AND CONSPIRACY TO  DEPRIVE PLAINTIFF'S CIVIL RIGHTS AND FREEDOM OF ASSOCIATION INVALIDATES THE ORDINANCE……………………………………………………………….15

IV.  CONSIDER A HYPOTHETICAL STATUTE FOR BLACK EMPLOYERS, HISPANICS, OR MUSLIM FEMALE GENITAL MUTILATION (KHIFAD) LAW SIMILAR TO THE "HINDU / INDIAN / SOUTH ASIAN" CASTE ORDINANCE OF SCC………22

V.    EXISTING U.S. LAWS AND CASE LAW ALREADY COVER CASTE DISCRIMINATION, MAKING SCC's ORDINANCE UNNECESSARY, RECKLESS, & HARMFUL…………………… 24

CONCLUSION ........................................................................35

CERTIFICATE OF COMPLIANCE.........................................................36

CERTIFICATE OF SERVICE .................................................................37

# TABLE OF AUTHORITIES

## CASES

*Aetna Life Ins. Co. v. Haworth,*
    300 U.S. 227 (1937) .............................................................. 7

*Al-Khazraji v. St. Francis Coll.,*
    784 F.2d 505 (3d Cir. 1986)......................................... 30, 31

*Ariz. Right to Life Pol. Action Comm. v. Bayless,*
    320 F.3d 1002 (9th Cir. 2003) ......................................... 11

*Bostock v. Clayton County,*
    590 U.S. 644 (2020)…………………………………………….26, 27, 28

*Cantwell v. Connecticut,*
    310 U. S. 296 (1940) .......................................................... 13

*Catholic League for Religious & Civil Rights v. City & County of San Francisco,*
    624 F.3d 1043 (9th Cir. 2010) ........................................... 5

*Chaudhry v. City of Los Angeles,*
    751 F.3d 1096 (9th Cir. 2014) ........................................... 5

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,*
    140 S. Ct. 1009 (2020) ...................................................... 28

*D.W. v. Raufer,*
    839 F. App'x 723 (3d Cir. 2020) ..................................... 24

*Espinoza v. Mont. Dep't of Revenue, ___U.S.___,*
    140 S.Ct. 2246; 207 L.Ed.2d 679...................................... 13

*Fonseca v. Sysco Food Servs. of Ariz., Inc.,*
    374 F.3d 840 (9th Cir. 2004) ........................................... 32

*Gladstone, Realtors v. Vill. of Bellwood,*
    441 U.S. 91 (1979) .............................................................. 6

*James v. City of Montgomery*,
    823 F. App'x 728 (11th Cir. 2020)...................................................... 32

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................ 6

*Lujan v. Hughes Aircraft Co.*,
    243 F.3d 1181 (9th Cir. 2001) ............................................................ 4

*McDaniel v. Paty*,
    435 U. S. 618; 98 S. Ct. 1322; 55 L. Ed. 2d 593 (1978).................... 15

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ............................................................................ 7

*NRDC v. EPA*,
    464 F.3d 1 (D.C. Cir. 2006) ................................................................ 8

*Our Lady of Guadalupe School v. Morrissey-Berru*,
    140 S.Ct. 2049 (2020) ....................................................................... 14

*Rattlesnake Coalition v. U.S. Env't Prot. Agency*,
    509 F.3d 1095 (9th Cir. 2007) ............................................................ 4

*Reg'l Rail Reorganization Act Cases*,
    419 U.S. 102 (1974) ............................................................................ 7

*Saint Francis College v. Al-Khazraji*,
    481 U.S. 604 (1987) ......................................................... 29, 30, 31, 32

*Saud v. Days*,
    36 F.4th 949 (9th Cir. 2022)............................................................... 15

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696; 96 S. Ct. 2372 (1976) ................................................. 12

*Shaare Tefila Congregation v. Cobb*,
    481 U.S. 615 (1987) .......................................................................... 31

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .......................................................................... 10

*Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S.___,*
    137 S.Ct. 2012; 198 L.Ed.2d 551 ...................................................... 13

*Association of Data Processing Serv. Orgs. v. Camp,*
    397 U.S. 150 (1970) ............................................................................ 7

*Valley Forge Christian Coll. v. Ams. United for Separation of Church &*
    *State, Inc.,*
    454 U.S. 464 (1982) ............................................................................ 6

*Vicksburg Waterworks Co. v. Vicksburg,*
    185 U.S. 65 (1902) ............................................................................ 6

*Wilson v. Textron Aviation, Inc.,*
    820 F. App'x 688 (10th Cir. 2020) .................................................... 32

## STATUTES

Title 42 U.S.C.
    § 1981 .......................................................................................... 30, 31

## FEDERAL RULES

Federal Rules of Appellate Procedure
    Rule 29 .............................................................................................. 4
    Rule 32 ..........................................................................................2, 4

## INTERNATIONAL - UNITED KINGDOM (U.K.)

*Chandhok & Anor v. Tirkey* (Race Discrimination) [2014] U.K.EAT
0190_14_1912 (19 December 2014) / *Tirkey v. Chandok and another*
ET/3400174/2013………………………………………………………… 33

## OTHER AUTHORITIES (Last Visited on 09/11/2024)

Chinyere Ezie, Deconstructing the Body: Transgender and Intersex
    Identities and Sex Discrimination - The Need for Strict Scrutiny, 20
    COLUM. J. GENDER & L. 141, 178–80 (2011) ................................ 32

Daniel J. Walker, Note, Administrative Injunctions: Assessing the Propriety of on-Class Collective Relief, 90 CORNELL L. REV. 1119, 1129–32 (2005) ................................................................................... 6

America Against Caste Discrimination. https://aacdusa.org/ ............... 11

Written Declaration of Thenmozhi Soundararajan, Founder Director of Equality Labs to Superior Court of California, Santa Clara. https://castegate.org/wp-content/uploads/2023/01/EQLabs.pdf ..... 17

Equality Labs Survey on Caste, hosted on the Official Seattle City Council Page. https://clerk.seattle.gov/~cfpics/cf_322573f.pdf .................... 12

FCHS Official Letter to SCC urging to vote YES. https://clerk.seattle.gov/~cfpics/cf_322573m.pdf .............................. 20

Official Letter from Distinguished Professor Kevin Brown to SCC urging to vote YES.  https://clerk.seattle.gov/~cfpics/cf_322573s.pdf ........ 19

Parliament of U.K., House of Commons Library, Briefing Paper on The Equality Act 2010: Caste Discrimination, dated 8/3/2018. https://researchbriefings.files.parliament.uk/documents/SN06862/SN06862.pdf ............................................................................................ 33

A Historic Congressional Hearing on Caste in the U.S. https://thewire.in/caste/a-historic-congressional-hearing-on-caste-in-the-us ............................................................................................... 20

Even On the Day of the Vote, They Were Hatching Plans to Delay or Undermine the Legislation. https://tribe.article-14.com/post/-even-on-the-day-of-the-vote-they-were-hatching-plans-to-delay-or-undermine-the-legislation--640a507d05fdd ....................................................... 16

SPECIAL EDITION: Why I Voted No on Caste. https://us12.campaign-archive.com/?u=11a79978ca7225050bfabf7ad&id=8100dfe423 ....... 1

Preliminary Thoughts on Potential Constitutional Flaws in SB 403, a California Proposal to Prohibit Caste Discrimination. https://verdict.justia.com/2023/05/16/preliminary-thoughts-on-potential-constitutional-flaws-in-sb-403-a-california-proposal-to-prohibit-caste-discrimination ........................................................... 22

Chandhok & Anor v Tirkey (Race Discrimination) [2014] U.K.EAT
0190_14_1912 (19 December 2014).
https://www.bailii.org/uk/cases/U.K.EAT/2014/0190_14_1912.html
....................................................................................................................33

Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 107 S. Ct. 2022, 95 L. Ed.
2d 582, 43 FEP Cases 1305, 55 U.S.L.W. 4626 (1987), Court Opinion.
https://www.bloomberglaw.com/public/desktop/document/Saint_Franc
is_College_v_AlKhazraji_481_US_604_107_S_Ct_2022_95_L_?doc_id=
X5CBFL ............................................................................... 29

U.S. District Court Western District of Virginia (Harrisonburg)
CIVIL DOCKET FOR CASE #: 5:22-cv-00058-EKD-JCH.
https://www.bloomberglaw.com/public/desktop/document/ZalaetalvDe
epManagementIncetalDocketNo522cv00058WDVaOct102022Cour?do
c_id=X1Q6OG1AQSO2 ...................................................... 29

Memorandum of Law FOR CASE #: 5:22-cv-00058-EKD-JCH.
https://www.bloomberglaw.com/public/desktop/document/ZalaetalvDe
epManagementIncetalDocketNo522cv00058WDVaOct102022Cour/4?d
oc_id=X7M066LSI519FEBOBHSTVR8DE6G ............................... 29

Equality Labs on the Hindu Festival of Holi.
https://www.facebook.com/EqualityLabs1/posts/holi-is-here-because-
of-the-upper-caste-cultural-domination-of-the-south-asian-
d/2652476871649726/ ...................................................... 12

Government of U.K. Equality Act 2010:guidance.
https://www.gov.uk/guidance/equality-act-2010-guidance ............. 33

Government of U.K. Equality Act 2010 – Section 9(5) with caste.
https://www.legislation.gov.uk/ukpga/2010/15/pdfs/ukpga_20100015_e
n.pdf#page=15 ................................................................ 33

Khiara M. Bridges, The Dangerous Law of Biological Race, 82 FORDHAM
L. REV. 21, 52–57 (2013) ................................................. 32

Mark A. Lemley & Eugene Volokh, Freedom of Speech and Injunctions in
Intellectual Property Cases, 48 DU.K.E L.J. 147, 154–58 (1998)..... 6

Questioning the Roots of Female Genital Mutilation- Is it Faith or Culture?" by Mabintou Darboe, Linda H. Rammler M.Ed., Ph.D, University of Saint Joseph. https://www.illuminatenrhc.com/post/questioning-the-roots-of-female-genital-mutilation-is-it-faith-or-culture-by-mabintou-darboe ……………………………………………………………………………………A.5

Amicus Brief for Dr. Nargawala hearing, 6 November 2018, submitted by Equality Now, WeSpeakOut, Sahiyo, And Safe Hands For Girls In Support Of The United States. UNITED STATES DISTRICT COURT EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION, Case 2:18-mc-51358-BAF ECF No. 4, filed 09/24/18 https://equalitynow.storage.googleapis.com/wp-content/uploads/2018/11/16122811/2018.09.24_Motion_for_Leave_and_Brief_Amici_Curiae__18-mc-51358.pdf ………………………………………………A.6

## INTRODUCTION

On February 21, 2023, the Seattle City Council ("SCC") discussed and voted to approve caste-related Council Bill (CB) 120511. Current Council President, Sara Nelson ("Nelson") voted **NO** on the Bill as she **opposed adding caste as a protected class**. Mayor Bruce Harrell ("Harrell"), who had earlier signed the Bill into Ordinance, effusively praised Nelson while welcoming her as President of the Council in January 2024. Nelson replaced outgoing President Lisa Herbold ("Herbold"), co-sponsor of the Bill. 5-ER-326.

After the vote, Nelson published a detailed statement explaining why she voted **NO** on the caste Bill. Nelson explained that the Bill was sponsored by Councilmember Kshama Sawant ("Sawant") and that **the Bill bypassed the normal committee vetting process and received just one public discussion**.[1] 5-ER-327.

Nelson highlighted Sawant's discriminatory animus and illicit motive "**This legislation seems driven by interests that extend beyond caste discrimination** (as indicated in CM Sawant's

---

[1] SPECIAL EDITION: Why I Voted No on Caste. By Sara Nelson, Current Seattle City Council President. https://us12.campaign-archive.com/?u=11a79978ca7225050bfabf7ad&id=8100dfe423

1

comments and based on a survey from an advocacy organization whose data on caste discrimination was **discredited by a reputable source)**." 5-ER-341-342.

Nelson further stated, "I'm concerned that designating caste as a protected class in Seattle is a **reckless, unnecessary, and likely harmful solution when we have no data or research on the prevalence of the problem here in Seattle**." 5-ER-343.

Nelson termed the Bill "**reckless**" since it **explicitly links caste discrimination with people of South Asian descent and Hinduism** in the recitals: "(t)he concept of 'caste system' is primarily associated with the **South Asian** region, where its existence is linked to the **religiously sanctioned social structure of Hinduism**." 5-ER-353-354.

Nelson then confirmed that the Bill was **unnecessary** because "while caste *is* not a standalone protected class in any US jurisdiction, caste identity is associated with religion, race, ancestry, and national origin, so a claim of caste discrimination could be lodged under those existing protected classes."

Nelson pointed out the **rushed, secretive manner** in which the Bill was approved: "This Bill has been before us for less than two weeks and we only received the supporting documents on Friday (before a long weekend). A lot of new information has come to light in the past few days, and we've received hundreds of emails from constituents of South Asian descent who oppose this legislation."

Nelson drew attention to the **harmful** nature of the Bill "enshrining caste as a protected class here in Seattle perpetuates **racist and colonialist stereotypes and singling out Hindus as the perpetrators and victims of caste discrimination will only generate more anti-Hindu discrimination**. And the risk of drawing a difficult-to-disprove caste discrimination claim could dissuade some employers from hiring people of South Asian descent, which is the opposite of what this legislation is intended to do."

Finally, Nelson pointed out "while we may have ample documentation of caste discrimination internationally**, we have at best contradictory information on its prevalence in the United States. Worse, we have no data on the scope of the issue in Seattle**."

3

Nelson summarized the entire process as "So here we are, about to vote on legislation in just one public meeting to create a new protected class for caste, a culturally and historically nuanced concept the supermajority of us knew very little just a month ago."

## STANDARD OF REVIEW

Dismissal for lack of subject matter jurisdiction is reviewed de novo. *Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1186 (9th Cir. 2001). The District Court's underlying factual findings regarding subject matter jurisdiction are reviewed for clear error. *Rattlesnake Coalition v. U.S. Env't Prot. Agency*, 509 F.3d 1095, 1100 (9th Cir. 2007). This Court also reviews "de novo a District Court's determination of a party's Standing to bring suit."

## ARGUMENT

## I. PLAINTIFF HAS SUFFERED A CONCRETE INJURY IN FACT AND HAS VALID STANDING ON ALL CLAIMS.

When a 21-year-old man was shot and killed by the Los Angeles police in 2008, his family members sued the city. They claimed that the county coroner had failed to notify the family of their relative's death in a timely fashion and prevented them from burying him per their religion,

causing the family members to suffer emotional pain. The family alleged that twenty one days had elapsed between their relative's death and the notification of his family. The U.S. Court of Appeals for the Ninth Circuit held in 2014 that the family members had standing to bring this claim—not as representatives of the man's estate, **but on their own behalf—since they had suffered "emotional harm (injury in fact)**." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014).

Individual Catholics and a Catholic advocacy organization in San Francisco challenged San Francisco's adoption of a resolution criticizing the Catholic Church's stance on adoption by same-sex couples. The "[p]laintiffs allege[d] that their 'Sacred Scripture' 'presents homosexual acts as acts of grave depravity'" and that "the resolution conveys a government message of disapproval and hostility towards their religious beliefs," a message that portrayed them as "outsiders, not full members of the political community." The Ninth Circuit found in 2010 that the **plaintiffs had standing because they had suffered "spiritual or psychological harm**." *Catholic League for Religious & Civil Rights v. City & County of San Francisco*, 624 F.3d 1043 (9th Cir. 2010).

### 1. Plaintiff's injury is a concrete injury-in-fact.

Standing in federal courts is not limited to claims for retrospective relief like damages. Article III empowers the federal judiciary to hear cases in "[e]quity,"[2] which encompasses requests for prospective injunctions.[3] There is an unbroken historical practice of federal courts exercising jurisdiction over claims for prospective relief to prevent threatened injuries that have not yet occurred.[4]

Contrary to Defendant's assertion quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, (1992), the imminence requirement is simply one component of the requirement that a threatened injury not be too speculative, the mere fact that an injury is not imminent should not necessarily render that injury nonjusticiable. If an injury is inevitable, it

---

[2] U.S. CONST. art. III, § 2, cl. 1 ("The judicial Power shall extend to all Cases, in Law and Equity . . . .").

[3] *See, e.g.,* Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 DU.K.E L.J. 147, 154–58 (1998) (documenting the early American history of copyright injunctions); Daniel J. Walker, Note, *Administrative Injunctions: Assessing the Propriety of on-Class Collective Relief*, 90 CORNELL L. REV. 1119, 1129–32 (2005) (documenting the early history of injunctions in America).

[4] *See*, e.g., Vicksburg Waterworks Co. v. Vicksburg, 185 U.S. 65, 82 (1902) (holding that a "threatened" injury from illegal activity presented an actual case); *see also* Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982) (recognizing standing for a party who "personally has suffered some actual or threatened injury" (quoting Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 99 (1979))).

is justiciable even if it may not occur until the distant future.[5]

A dispute constitutes a justiciable case if a plaintiff has a personal interest at stake. A threat of injury, even if the threat is small, establishes a personal interest.[6]

Article III does not distinguish between low risks of harm and high risks of harm. The judicial power is properly invoked when a plaintiff has at stake a personal interest that is adverse to the defendant's interest and a court can vindicate that interest immediately through a judicial order based on a legal determination of the rights of the parties. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). (noting that to be justiciable, the dispute must "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts" (alteration in original) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)) (internal quotation marks omitted)).

---

[5] The Court has made this observation in the ripeness context. *See* Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 143 (1974) (finding a claim ripe even though the injury was not imminent because the "injurious event [was] certain to occur")

[6] Courts have defined the interests to support standing broadly to include not only economic and physical interests, but also aesthetic, spiritual, and recreational interests. *See* Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 154 (1970).

A plaintiff facing a threat of injury from a defendant's illegal conduct meets this threshold. That plaintiff has an interest in preventing that injury from occurring, or at least an interest in reducing the risk of its occurrence. That is the reason why courts have held that they have jurisdiction to hear claims for prospective relief. *NRDC v. EPA*, 464 F.3d 1, 7 (D.C. Cir. 2006) (finding risk of 1 in 200,000 sufficiently substantial to support standing).

The same reasoning applies when the risk of injury is extremely low. In such cases, the plaintiff still has a personal interest that the courts may vindicate through an appropriate order. The fact that the injury might not occur does not render the claim nonjusticiable; otherwise, federal courts would lack jurisdiction to hear *any* claims for prospective relief because all potential future injuries have some chance of not transpiring.

Rather, it is the possibility that the injury might occur that creates the plaintiff's interest in the case and that ought to render the case justiciable. Even when the risk of harm is very low, there is still some chance that the threatened injury will occur. The plaintiff accordingly has an interest at stake: he or she may be harmed.

8

On March 29, 2023, Plaintiff received a personal invitation from Dr. Amit Shukla, Dean of Seattle University, to attend an in-person annual Projects Day event on June 2, 2023, at the Seattle University Campus.

Plaintiff immediately registered for the event, purchased airline tickets to fly to Seattle, and made other travel arrangements. Plaintiff was looking forward to visiting his alma mater and attending the in-person event, however, Plaintiff was apprehensive about the caste Ordinance introduced by SCC just over a month ago.

Concerned about the caste Ordinance, Plaintiff filed several complaints to federal, state, and local authorities like the US Department of Justice, The City of Seattle, and the State of Washington. Plaintiff also filed a tort complaint and sent it to the Seattle City clerk's office requesting that a temporary injunction be placed on the caste Ordinance.

The response from all these agencies was the same – that they were unable to assist Plaintiff in any way and that Plaintiff should consult a lawyer to explore litigation options. 6-ER-417.

Having exhausted all avenues of legal remedy, Plaintiff was finally forced to file a civil action lawsuit in the Seattle District Court requesting that a temporary injunction be placed on the caste Ordinance so that

Plaintiff could travel to Seattle to attend the in-person event.

When it became apparent that the Seattle District Court was in no rush to consider Plaintiff's request for a temporary injunction, Plaintiff was left with no choice but to cancel his airline tickets and other travel arrangements to Seattle and was thus denied the opportunity to travel to his alma mater despite being personally invited by the Dean. This clearly shows that Plaintiff has already suffered a concrete injury in fact.

### 2. Plaintiff has suffered the constitutionally recognized harm of self-censorship.

SCC's attempt to differentiate the Plaintiffs' self-censorship case law falls short, as they argue that other plaintiffs established standing by abstaining from specific actions. The caste Ordinance has caused Plaintiff to refrain from celebrating the Hindu festival of Holi, wearing Mauli (sacred thread on the wrist), eating vegetarian food in public, and attending events of Coalition of Hindus of North America (CoHNA).

Plaintiff is therefore no different than the *Dreihaus* plaintiffs who "planned" to speak about taxpayer-funded abortion but refrained due to the law at issue, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 154 (2014); or the *Bayless* plaintiffs who "wanted to disseminate advertising without providing twenty-four-hour advance notice" except the law

10

prohibited that conduct, *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). Those cases establish that plaintiffs possess standing when they refrain from certain conduct due to a challenged law. That is precisely the argument Plaintiff makes here.

Sawant, on numerous occasions, has called CoHNA and its members upper caste right-wing Hindu fundamentalists responsible for the genocide of Muslims in India. Sawant is part of an organization, America Against Caste Discrimination (AACD) which states that "Caste-based discrimination is a systemic form of oppression that has its roots in the caste system in India." This organization also believes that "No matter what the Hindus say, Hinduism is a menace to liberty, equality, and fraternity. It is incompatible with democracy. Hindu raj must be prevented at any cost."[7]

Equality Labs ("EQL"), and its founder-director, Thenmozhi Soundararajan ("Soundararajan") with whom Sawant conspired and collaborated to push the caste Ordinance describes Holi as "upper-caste cultural domination of the South Asian diaspora", hence, anyone

---

[7] America Against Caste Discrimination. https://aacdusa.org/

celebrating Holi would be considered "saffron-washed", "violent", involved in "white supremacy and settler colonialism" and "Brahmanical" aka "Upper Caste Oppressor." [8]

Similarly, the EQL caste survey report used by SCC to prove claims of "rampant caste discrimination" in Seattle and the rest of the U.S. asserts that eating vegetarian food sends a message of "upper" Caste Hindu cultural hegemony.[9] (Page 24).

## II. INCLUDING "CASTE" IN SCC's ORDINANCE VIOLATES THE FIRST AND FOURTEENTH AMENDMENTS.

SCC attempts to define Hinduism by doing what the U.S. Constitution says it cannot, asserting a government right to resolve questions of religious doctrine. Preventing the government from establishing religious doctrines or interfering with religious practices is as old a principle as the Republic itself. As American courts have recognized since the earliest days of our Constitution, those principles require a clear and unambiguous prohibition on any "civil determination of religious doctrine." *Serbian E. Orthodox Diocese v.*

---

[8] Equality Labs on the Hindu Festival of Holi.
https://www.facebook.com/EqualityLabs1/posts/holi-is-here-because-of-the-upper-caste-cultural-domination-of-the-south-asian-d/2652476871649726/
[9] Equality Labs Survey on Caste, hosted on the SCC official site. Page 24.
https://clerk.seattle.gov/~cfpics/cf_322573f.pdf

*Milivojevich*, 426 U.S. 696, 708-09, 96 S. Ct. 2372, 2380 (1976).

### 1. SCC's hostility towards Hinduism, violates the Free Exercise Clause.

SCC has imposed special disabilities on Hindu Americans by acting under color of state law to wrongly define Hindu beliefs, teachings, and practices to include an abhorrent practice of discrimination. SCC has violated the free exercise rights of Hindu Americans by imposing special disabilities based on religion by wrongly claiming that Hindus believe in and participate in a discriminatory caste system and declaring that this abhorrent practice leads them to illegally discriminate on the basis of caste.

Laws violate the Free-Exercise Clause when they "impose special disabilities on the basis of religious status." *Espinoza v. Mont. Dep't of Revenue*, ___U.S.___ [140 S.Ct. 2246, 2254-2255, 207 L.Ed.2d 679, 689-690] (2020); *citing Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S.___ [137 S.Ct. 2012, 2016, 198 L.Ed.2d 551, 555] (2017); *see also Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

### 2. SCC Attempted to Target and Define Hinduism, violating the Establishment Clause.

SCC expressly did what the Establishment Clause prohibits, it attempted to define matters of Hindu doctrine and faith against the

express teachings of Hinduism. *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S.Ct. 2049 (2020); citing *Hosanna-Tabor*, 565 U. S., at 186 (quoting Kedroff, 344 U. S., at 116). SCC's selection of the word caste was tied to its hostility towards Hinduism and was used to target the Hindu religion, which violated the Establishment Clause.

### 3. SCC Attempted to Define Hinduism, violating the Due Process Clause.

SCC's position in wrongly seeking to legally define Hinduism to include belief and practice in caste and a hierarchical caste system is so standardless that it would actually require the very discrimination that it seeks to prevent.

SCC failed to define caste, instead, it blindly copied the definition of ancestry under caste. Not only that, SCC made no attempts to correct it although it had enough time (February 21, 2023, to May 10, 2023) until the time Plaintiff pointed out this blatant and intentional copy-and-paste deception. ER-375 – 380.

### 4. SCC Attempted to Single Out Hinduism, violating the Equal Protection Clause.

SCC expressly did what the Constitution's Equal Protection clause prohibits, it used "religion as a basis of classification for the imposition

14

of duties, penalties, privileges or benefits." (*McDaniel v. Paty*, 435 U. S. 618, 639, 98 S. Ct. 1322, 55 L. Ed. 2d 593 (1978) (J. Brennan, opinion concurring in judgment).

Religion is therefore a suspect class under the 14th Amendment's Equal Protection Clause. *Saud v. Days,* 36 F.4th 949, 953 (9th Cir. 2022). The SCC's actions targeting Hindu Americans and Indian Americans it believes are Hindu are, therefore, subject to strict scrutiny.

National origin is a suspect class under the 14th Amendment's Equal Protection Clause. *Saud v. Days,* 36 F.4th 949, 953 (9th Cir. 2022).

Sawant, by falsely claiming that Indian American engineers at Cisco Systems engage in caste discrimination has acted in a discriminatory manner against Hindu and non-Hindu Indian Americans based on national origin.

### III. SCC's ILLICIT MOTIVE, DISCRIMINATORY ANIMUS, AND CONSPIRACY TO DEPRIVE PLAINTIFF'S CIVIL RIGHTS AND FREEDOM OF ASSOCIATION INVALIDATES THE ORDINANCE

In a public interview on March 10, 2023, Sawant stated "But winning it [the caste Ordinance] was far from easy or straightforward. We

15

won only after a **massive fightback against the Modi-aligned Hindu right wing**. **The right-wing turned up in City Hall in big numbers and viciously opposed our resolution**."[10]

Sawant continued to label any opposition to the Ordinance as "Our Ordinance was strenuously opposed by **right-wing, Hindu fundamentalist organizations** like the Hindu American Foundation (HAF) and the **Coalition of Hindus of North America (CoHNA)**." Plaintiff is a member of CoHNA but has stopped participating in CoHNA events for fear of being labeled as a "Right Wing Fundamentalist Hindu aligned with the Hindu Nationalist Modi government in India and complicit in the genocide of Muslims in the western Indian state of Gujrat."

Sawant then equated Plaintiff to the Christian right wing opposed to the LGBTQ+ Community "For instance, when the **right wing falsely claimed that a ban on caste discrimination would be anti-Hindu**, we pointed out how it was eerily reminiscent of the **Christian right wing** contending that their religious beliefs justified discriminating

---

[10] Even On the Day of the Vote, They Were Hatching Plans to Delay or Undermine the Legislation. By Priya Ramani, dated 3/10/2023. https://tribe.article-14.com/post/-even-on-the-day-of-the-vote-they-were-hatching-plans-to-delay-or-undermine-the-legislation--640a507d05fdd

against the LGBTQ+ community."

On numerous occasions, Sawant gave preference to Muslim Americans over Hindu Americans, praising Muslims as "fierce activists" and denouncing Hindus as "Right Wing Fundamentalists." 3-ER-65-101.

Sawant made false statements using a fraudulent survey: "Data from Equality Labs show that one in four caste-oppressed people faced physical and verbal assault, one in three faced education discrimination, and two in three (77%) faced workplace discrimination."

Sawant then praised Muslim organizations while condemning Hindu organizations "We've won the support of many grassroots organizations in the South Asian community and beyond, like the **Indian American Muslim Council** and the Coalition of Seattle Indian Americans, for example, who were a crucial part of the struggle to pass a resolution condemning the racist CAA-NRC citizenship laws."

On November 2, 2020, Soundararajan gave a written declaration to the Superior Court of the State of California, County of Santa Clara stating the following. 6-ER-431.[11]

---

[11] Written Declaration of Thenmozhi Soundararajan in the Superior Court of California, Santa Clara, on 11/2/2020. https://castegate.org/wp-content/uploads/2023/01/EQLabs.pdf

Caste is a structure of oppression that affects over 1 Billion people across the world. **It is a system of religiously codified exclusion that derives from Hindu Scripture**. Page 2, Lines 13-14.

**Brahmins, who founded India's caste system, are at the top of the caste system** and have benefited from centuries of privilege, access, and power because of it. Page 2, Lines 18-19.

This entire system… **most notably India… has persisted and thrived for more than 2,000 years**. Page 2, Lines 21-24.

The irony… while **the Indian caste system to which the complainant belongs has its origins in Hindu scripture**… Page 3, Lines 25-26.

At Equality Labs, our experience has been that **dominant-caste people** openly boast about their caste privilege and supposed **biological superiority**. Page 4, Lines 22-23.

The culture of intimidation of Dalits who report casteism **has old roots in the culture of impunity in India**. Page 5, Lines 17-18.

Distinguished Professor Kevin Brown ("Brown"), an expert on caste, in his official letter dated February 11, 2023, to SCC, urging SCC to vote YES on the Ordinance, wrote: "The caste system is often associated with the

**Hindu religion** on the **Indian** subcontinent. Like all immigrants, **South Asians** brought their beliefs with them to the United States, including those about the caste system."[12]

To impress upon SCC, Brown boasted of his "Hindu" caste credentials and experience "I write this letter as an African-American law professor who has researched and written about discrimination based on caste and race since being a **Fulbright Lecturer to India from December 1996 to May 1997**." Brown compared the "**Indian caste system**" with the treatment of Black people in the U.S. and the horrors of slavery in the South. Brown has also coined the term "**caste Hindu**." 5-ER-352-354.

The Feminist Critical Hindu Studies Collective (FCHS) asserted in their letter to SCC that "the categories—**Hinduism and Hindu**—not only arise in conjunction with forms of **white supremacy and caste supremacy** but are imbricated with them. All of the groups that oppose this issue including **Coalition of North American Hindus,** Hindu American Foundation, Hindu Pact, and others are known to take extreme positions in the Hindu community and are **led by dominant caste**

---

[12] Official Letter from Distinguished Professor Kevin Brown dated 2/11/2023 to SCC urging to vote YES on caste Bill. https://clerk.seattle.gov/~cfpics/cf_322573s.pdf

**leadership** that is aligned with **right-wing** ethnonationalist movements in India." [13]

During the first congressional hearing dated May 22, 2019, on caste, hosted by EQL and Rep. Pramila Jayapal, D-WA, Seattle, ("Jayapal") every single one of the five speakers who gave testimonies, **equated caste to Hinduism**, using terms like "dirty **Chamars**" and "**South Asian**" families, leaving no doubt that participants of the congressional hearing blamed caste as an exclusive Hindu construct mandated by the Hindu religion and scriptures.[14]

"We had representatives from all of the major progressives, including the briefing being hosted by Pramila Jayapal, US representative from Washington's 7th congressional district, said Thenmozhi Soundararajan, executive director of Equality Labs."

In addition, the congressional briefing also brought to light how in colleges, "upper" caste students refuse to share rooms with Dalits. Campuses also often have **Hindu students' associations**, leaving out all

---

[13] Official Letter from FCHS to SCC dated 02/16/2023 urging to vote YES on caste Bill. https://clerk.seattle.gov/~cfpics/cf_322573m.pdf

[14] A Historic Congressional Hearing on Caste in the US. By Mariya Salim, dated 5/27/2019. https://thewire.in/caste/a-historic-congressional-hearing-on-caste-in-the-us

those who do not adhere to **"upper" caste Hindu practices and culture**.

Sawant (state actor), Soundararajan, Jayapal (state actor), and other powerful academics like Brown and activist groups like AACS and FCHS have formed a cabal to conspire and collaborate in targeting Hindu Americans by deliberately using Hindu terms like "caste" and "varna" despite having the alternative to use facially neutral terms like "inherited social class or status" or "social classification, stratification, and hierarchy."

Plaintiff has demonstrated causation because the only aspect of the Ordinance that could support claims of discrimination against Plaintiff for his Hindu practices is the use of the term caste. The injury is redressable. Including caste in the Ordinance allows SCC to make accusations against Plaintiff based on his religious practices, such as celebrating Holi, eating vegetarian food, wearing religious symbols like Mauli, and participating in activities held by CoHNA due to the direct association others have alleged between these activities and caste.

Removing caste or replacing it with a neutral term like "socially inherited class or status" and removing any and all references to Hinduism, India, South Asia, and any other religion, country, continent, or scriptures eliminates the risk to Plaintiff and all others similarly situated.

21

## IV. CONSIDER A HYPOTHETICAL STATUTE FOR BLACK EMPLOYERS, HISPANICS, OR MUSLIM FEMALE GENITAL MUTILATION (KHIFAD) LAW SIMILAR TO THE "HINDU / INDIAN / SOUTH ASIAN" CASTE ORDINANCE OF SCC

Consider the following hypothetical statute: It shall be unlawful for[15] **Black** employers, and all other employers, [to do X]. Such a statute does not *regulatorily* treat Black employers differently from other employers, since "all" employers are prohibited from engaging in the proscribed conduct. But the specific, selective, and gratuitous textual mention of **Black** employers would very likely trigger strict scrutiny and result in the statute's invalidation, given that the stigmatic messages against **Black** employers arising from the hypothetical law inflict one important kind of injury the Equal Protection Clause was designed to prevent.

The textual non-neutrality of this hypothetical statute would give rise to a strong suspicion that the legislature intended to criticize (and thereby **demean**) **Black** employers in particular, and that the burdens imposed on all other employers amount simply (or at least largely) to

---

[15] Preliminary Thoughts on Potential Constitutional Flaws in SB 403, a California Proposal to Prohibit Caste Discrimination. By Vikram David Amar. https://verdict.justia.com/2023/05/16/preliminary-thoughts-on-potential-constitutional-flaws-in-sb-403-a-california-proposal-to-prohibit-caste-discrimination

collateral damage. This would be especially true if the forbidden employer practice at issue were particularly common among or nearly unique to **Black** employers.

And it would remain true even if the purported *beneficiaries* of the law were also predominantly **Black** (employees), for example, in the setting of colorism. So too here, the fact that the caste Ordinance's text ostensibly seeks to help some **South Asians** (victims of caste discrimination) even as it seemingly slights others does not necessarily validate the law, because, in any event, the distinctive concern with one ethnic group raises suspicions about whether all persons are being treated, or protected, equally.

Imagine another law that says it shall be illegal to discriminate against **Hispanic** persons on the basis of their race but by its terms leaves everyone free to discriminate on the basis of race against **non-Hispanics.**

Imagine yet another ordinance by SCC that attempts to ban Female Genital Mutilation (FGM), but deliberately uses the **Arabic** term "khafd" or "khifad", calling it a "**Muslim** practice" sanctioned by "**Islamic Sharia Law**" and SCC publicly declares that the purpose of this Ordinance is to address the "khafd" or "khifad" practiced by the "hundreds and thousands" of "**Muslim**" immigrants from **Somalia** living in Seattle. Please see Motion to Supplement record filed on 09/11/2024, Dkt Entry: 29.1, Pages A.1 - A.9.

## V.   EXISTING U.S. LAWS AND CASE LAW ALREADY COVER CASTE DISCRIMINATION, MAKING SCC's ORDINANCE UNNECESSARY, RECKLESS, & HARMFUL

In *D.W. v. Raufer*, 839 F. App'x 723 (3d Cir. 2020), substantial evidence supported the U.S. Citizen and Immigration Services (USCIS) determination in denying asylum application based on applicants' status in one of the lowest castes in India's caste system... applicant was educated and skilled in dental medicine, the applicant had a recent trip to India, India had affirmative action program and prohibition on discrimination. USCIS did not violate the applicant's due process rights by considering articles showing lower caste individuals achieving success and societal respect in metropolitan areas without allegedly providing an opportunity to rebut.

To support its conclusion, USCIS cited D.W.'s education and skills, India's affirmative action program, and the prohibition on discrimination, and reports indicating violence against well-educated Dalits is not widespread. Further, it relied on D.W.'s recent trip to India as evidence that the past persecution he suffered was not severe enough to warrant granting asylum by an exercise of agency discretion.

24

USCIS applied the correct standard in deciding whether the presumption was rebutted and that its decision was rationally based on substantial evidence showing that D.W. could safely and reasonably relocate within India.

D.W. pointed to reports and articles showing continued discrimination and violence against Dalits in India. However, USCIS considered these reports and articles and concluded the violence and discrimination were not sufficiently widespread to render relocation unsafe or unreasonable. USCIS's determination that D.W. could safely and reasonably relocate to India was rationally based on the following substantial evidence: D.W.'s education and skills, D.W.'s recent trip to India, India's affirmative action program and prohibition on discrimination, reports indicating violence against well-educated Dalits is not widespread, and news articles showing Dalits achieving success and societal respect in metropolitan areas.

Accordingly, USCIS's decision correctly applied the rebuttable presumption test and was rationally based on substantial evidence.

The Third Circuit's ruling establishes beyond any reasonable doubt that Dalits who migrated to the U.S. from India can safely and reasonably

relocate back to India since caste discrimination is not sufficiently widespread to render relocation to India unsafe or unreasonable.

Hence, it would be absurd to suggest that Dalits would be at a greater risk of caste discrimination in the U.S. (compared to India) and require a "special caste law" given that existing U.S. laws already cover caste discrimination. The California Unruh Act and other similar State and federal laws, specifically Title VII, cover and prohibit caste discrimination.

Existing U.S. laws that have facially neutral umbrella terms such as race, religion, national origin, and ancestry are the best manner in which caste discrimination can be addressed in the U.S. Courts have interpreted these protections to encompass categories that are not specifically named. Notably, the U.S. Supreme Court's 2020 decision in *Bostock v. Clayton County,* 590 U.S. 644 (2020), found that workplace bias based on sexual orientation and gender identity falls underneath the federal ban on "sex" discrimination.

The court's reasoning in *Bostock* supports the argument that caste is already protected under existing categories such as race, ancestry, national origin, or religion. Earlier Supreme Court precedent also ensures that caste is covered under Section 1981 of the 1866 Civil Rights Act. Thus, the

26

analysis used by the Supreme Court in *Bostock,* a major Landmark Title VII case decided in 2020, already addresses caste discrimination in the U.S.

The approach taken by the Supreme Court in *Bostock*, when applied to a claim of caste discrimination, does not require caste to be a separate stand-alone category or even a sub-category or a sub-group. In *Bostock,* the Court addressed whether discrimination against gay, lesbian, and transgendered individuals constitutes sex discrimination under Title VII. In addressing the question, Justice Neil Gorsuch explained that in Title VII claims, "a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause."

There can be multiple but-for causes. Gorsuch noted that although a person's sexual orientation and gender identity are separate and distinct from a person's sex, their sex is nevertheless inextricably linked to their other status. Even if an employer's goal is only to discriminate against a person because they are gay, lesbian, or a transgender individual, it is not possible without also discriminating against the person because of their sex. To demonstrate this, Gorsuch noted that if you changed the gay, lesbian, or transgender individual's sex, say a gay man to a woman, would that change lead to a different outcome by the employer? If the answer is yes, then the

27

discrimination is also based on sex.

Clearly, here, the answer is yes, because the change would eliminate the gay, lesbian, or transgender status that was the motivation for the adverse employment treatment. Although an individual's status as gay, lesbian, or transgender is not a listed protected trait, *Bostock* holds, it is equivalent to discrimination based on the protected trait of sex.

The *Bostock* approach can also be successfully applied in a Section 1981 claim. Even though Section 1981 does not contain the "because of" language found in Title VII, in order to establish causation, the Supreme Court recently reiterated that a successful Section 1981 plaintiff must demonstrate that "but for race," the defendant would not have taken the discriminatory action the defendant took.[16]

---

[16] Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009 (2020). Justice Gorsuch delivered the opinion of the Court in this case as well. The Court restated its embrace of the "but-for" test for the application of § 1981 to race discrimination, holding that [t]he guarantee that each person is entitled to the "same right . . . as is enjoyed by white citizens" directs our attention to the counterfactual—what would have happened if the plaintiff had been white? This focus fits naturally with the ordinary rule that a plaintiff must prove but-for causation. If the defendant would have responded the same way to the plaintiff even if he had been white, an ordinary speaker of English would say that the plaintiff received the 'same' legally protected right as a white person. Conversely, if the defendant would have responded differently but for the plaintiff's race, it follows that the plaintiff has not received the same right as a white person.

28

Earlier Supreme Court precedent has recently been used by James E. Goodley, a Philadelphia attorney at Goodley McCarthy LLC for a caste discrimination lawsuit. Goodley recently represented five former hotel workers in reaching a successful settlement on caste bias claims[17] in a Virginia federal court. In one brief,[18] Goodley cited the Supreme Court's 1987 decision[19] in *Saint Francis College v. Al-Khazraji* to argue that Section 1981 covers caste and other traits related to ancestry.

Although there was no final decision on the merits, the Virginia court denied the defendants' motion to dismiss, allowing the caste bias claims to proceed. "The court believed, in my personal opinion, that if we could prove what we alleged then that's a viable claim," Goodley said.

---

[17] U.S. District Court, Western District of Virginia (Harrisonburg), CIVIL DOCKET FOR CASE #: 5:22-cv-00058-EKD-JCH.
https://www.bloomberglaw.com/public/desktop/document/ZalaetalvDeepMan
agementIncetalDocketNo522cv00058WDVaOct102022Cour?doc_id=X1Q6O
G1AQSO2
[18] Memorandum of Law FOR CASE #: 5:22-cv-00058-EKD-JCH.
https://www.bloomberglaw.com/public/desktop/document/ZalaetalvDeepMan
agementIncetalDocketNo522cv00058WDVaOct102022Cour/4?doc_id=X7M0
66LSI519FEBOBHSTVR8DE6G
[19] Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 107 S. Ct. 2022, 95 L. Ed.
2d 582, 43 FEP Cases 1305, 55 U.S.L.W. 4626 (1987), Court Opinion.
https://www.bloomberglaw.com/public/desktop/document/Saint_Francis_Coll
ege_v_AlKhazraji_481_US_604_107_S_Ct_2022_95_L_?doc_id=X5CBFL

The Supreme Court's decision in *Saint Francis College v. Al-Khazraji* 481 U.S. 604 (1987) supports the contention that discrimination based on race would be interpreted to include discrimination based on ancestry, and therefore, based on caste as well. There, a professor — who was an American citizen born in Iraq — filed suit alleging that his denial of tenure was based on his Arabian heritage and thus constituted unlawful discrimination under 42 U.S.C. § 1981. *Id.* at 606. The district court dismissed the complaint, ruling that a claim under § 1981 could not be maintained for discrimination based on being of the "Arabian race." *Id.*

The Court of Appeals for the Third Circuit reversed, holding that the complaint properly alleged discrimination based on race. In so doing, the court of appeals explained that § 1981 was not limited to present racial classifications. Instead, the statute evinced an intention to recognize "at the least, membership in a group that is ethnically and physiognomically distinctive." *Id.* (quoting *Al-Khazraji v. St. Francis Coll.*, 784 F.2d 505, 517 (3d Cir. 1986)).

The Supreme Court affirmed the court of appeals' decision and held that discrimination based on "Arabian ancestry" is racial discrimination under 42 U.S.C. § 1981. *Id.* at 607. The Court stated that the court of

30

appeals "was thus quite right in holding that § 1981, 'at a minimum,' reaches discrimination against an individual 'because he or she is genetically part of an ethnically and physiognomically distinctive subgrouping of homo sapiens.'" *Id.* at 613 (quoting *Al-Khazraji*, 784 F.2d at 517).

The Court cautioned, however, that this was sufficient but not necessary, and that in this case, Arab heritage was sufficient because the statute evinced that Congress intended to protect people from discrimination "because of their ancestry or ethnic characteristics." *Id.*; see also *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617 (1987) (holding that a claim for discrimination based on Jewish heritage is cognizable under 42 U.S.C. § 1981, for similar reasons).

Indeed, the Court may have been eschewing a biological or genetic conception of race, in favor of an understanding predicated on social construction. To this point, the Court noted: Many modern biologists and anthropologists, however, criticize racial classifications as arbitrary and of little use in understanding the variability of human beings. It is said that genetically homogeneous populations do not exist and traits are not discontinuous between populations; therefore, a population can only be

described in terms of relative frequencies of various traits. Clear-cut categories do not exist. The particular traits which have generally been chosen to characterize races have been criticized as having little biological significance. It has been found that differences between individuals of the same race are often greater than the differences between the "average" individuals of different races. These observations and others have led some, but not all, scientists to conclude that racial classifications are for the most part sociopolitical, rather than biological, in nature.[20]

Thus, the U.S. Supreme Court understood ancestry discrimination as a type of racial discrimination.[21] And under the Court's understanding of "ancestry or ethnic characteristics," even if formed primarily due to

---

[20] Al-Khazraji, 481 U.S. at 610 n.4. See also Khiara M. Bridges, The Dangerous Law of Biological Race, 82 FORDHAM L. REV. 21, 52–57 (2013) (same); Chinyere Ezie, Deconstructing the Body: Transgender and Intersex Identities and Sex Discrimination — The Need for Strict Scrutiny, 20 COLUM. J. GENDER & L. 141, 178–80 (2011) (embracing the Al-Khazraji Court's conception of race).

[21] The basic contours of what constitutes racial discrimination under § 1981 also apply in Title VII cases, and vice versa. Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 850 (9th Cir. 2004) ("Analysis of an employment discrimination claim under § 1981 follows the same legal principles as those applicable in a Title VII disparate treatment case."); Wilson v. Textron Aviation, Inc., 820 F. App'x 688, 692 (10th Cir. 2020) ("The elements of a race discrimination claim brought under § 1981 or Title VII are the same."); James v. City of Montgomery, 823 F. App'x 728, 732 (11th Cir. 2020) ("The elements of race discrimination claims under § 1981 and Title VII are the same and therefore need not be analyzed separately.").

sociopolitical forces, caste would qualify as ancestry, and thus caste discrimination as ancestry discrimination and race discrimination.

The Equality Act[22] of the United Kingdom (U.K.) was amended in 2013 to include Section 9(5)[23], which allowed the government to bring forth legislation classifying caste as an aspect of race, thereby making caste discrimination a sub-group within race. The British government, however, reviewed[24] its position on introducing such a law after the Employment Tribunal's decision in *Chandhok & Anor v Tirkey[25]*. The Tribunal held that notwithstanding caste's distinctiveness, some instances of caste discrimination could be unlawful under the existing grounds prohibiting racial discrimination under the Equality Act.

In the U.K., the important case of *Tirkey* has allowed claims for caste discrimination to proceed under the Equality Act as a form of race

---

[22] Equality Act of the United Kingdom.
https://www.gov.uk/guidance/equality-act-2010-guidance
[23] Section 9(5) of the Equality Act that includes caste.
https://www.legislation.gov.uk/ukpga/2010/15/pdfs/ukpga_20100015_en.pdf#page=15
[24] U.K. Government Review of the Equality Act.
https://researchbriefings.files.parliament.uk/documents/SN06862/SN06862.pdf
[25] Chandhok & Anor v. Tirkey (Race Discrimination) [2014] U.K.EAT 0190_14_1912 (19 December 2014)
https://www.bailii.org/uk/cases/U.K.EAT/2014/0190_14_1912.html

discrimination. Ms. Tirkey went on to win her claim after establishing that caste discrimination is unlawful. In *Chandhok & Anor v. Tirkey U.K.EAT/0190/14/KN* (previously reported in the employment tribunal as *Tirkey v. Chandok and Another ET/3400174/13*), the tribunal considered whether a claim for caste discrimination should have been allowed to continue, despite the government not yet having prohibited caste discrimination under the Equality Act 2010.

The Government of the U.K., after much deliberation and public consultation spanning multiple years, announced on July 23, 2018, that caste discrimination was already covered by ethnic origins and that adding a new category of caste would be of a "clearly controversial nature."

The U.K. public consultation findings state that "legislating for caste is an exceptionally controversial issue, deeply divisive within certain groups, as the last few years have shown: it is as divisive as legislating for class to become a protected characteristic would be across British society more widely. Reliance on case law, and the scope for individuals to bring claims of caste discrimination under ethnic origins rather than caste itself, is likely to create less friction between different groups and help community cohesion." The same logic applies to Seattle, California, and the U.S.

34

## CONCLUSION

This Court should reverse the District Court's dismissal of Plaintiff's Claims for lack of Standing and remand for further proceedings on all of those Claims as outlined in Plaintiff's Complaint and Plaintiff's Opposition to Defendants' Motion To Dismiss.


Dated: September 11, 2024          Respectfully submitted,

                                    */s/ Abhijit Bagal*
                                    ABHIJIT BAGAL

                                    *Plaintiff-Appellant (Pro Se)*




ABHIJIT BAGAL
125 Vista Brooke Drive
Morrisville, NC 27560
(919) 917-3839
abebagal@gmail.com

*Plaintiff-Appellant (Pro Se)*

**Stop Weaponization of caste to Single Out, Target, & Racially Profile Hindu Americans.**

# CERTIFICATE OF COMPLIANCE

This brief contains 6,797 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1(a).

Dated: September 11, 2024.

/s/ *Abhijit Bagal*
Abhijit Bagal

*Plaintiff-Appellant (Pro Se)*

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2024, I electronically filed the foregoing Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

/s/ *Abhijit Bagal*
Abhijit Bagal

*Plaintiff-Appellant (Pro Se)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated                    .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                                    **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                    *Rev. 12/01/22*